UNITED STATES of America, Plaintiff,

v.

Fernando
RUIZ–VILLANUEVA, Defendant.

UNITED STATES of America, Plaintiff,

v.

Richard Arnold LINARES, Defendant.

UNITED STATES of America, Plaintiff,

v.

Charles SANTEE, Defendant.

UNITED STATES of America, Plaintiff,

v.

Jane CASAREZ, Defendant.

Crim. Nos. 87–1296–E, 87–1337–E,
87–1345–E and 87–1350–E.

United States District Court,
S.D. California.

Feb. 29, 1988.

As Amended March 3, 1988.

Peter K. Nunez, U.S. Atty., Roger W. Haines, Asst. U.S. Atty., S.D.Cal., San Diego, Cal., Douglas Letter, Thomas Millet, Civ. Div., John F. DePue, Karen Scrivseth, Crim. Appeals Div., Dept. of Justice, Paul M. Bator, Andrew L. Frey, Kenneth S. Geller, Stephen G. Gilles, Mayer, Brown & Platt, Washington, D.C., for plaintiff.

Judy Clarke, Larry N. Ainbinder, Ezekiel E. Cortez, Steven Meinrath, Federal Defenders of San Diego, Inc., Robert Carriedo, San Diego, Cal., Alan Morrison, Public Citizen Litigation Group, Washington, D.C., for defendant.

John R. Steer, Gen. Counsel, U.S. Sentencing Comm., Washington, D.C., Steer, Meyer & Brown, appeared through an amicus brief, for the Commission itself.

## MEMORANDUM DECISION

ENRIGHT, District Judge.

Defendants in the above-captioned cases move the court for an order declaring unconstitutional the sentencing guidelines (hereinafter "Guidelines") recently promulgated by the United States Sentencing Commission ("Commission"). Upon due consideration of the memoranda and arguments of all parties, the court finds that defendants' arguments are not meritorious; accordingly, their motions must be denied.[1]

## INTRODUCTION

### I.

### *The Sentencing Reform Act of 1984*

After several years of hearings and bipartisan negotiations, and with the apparent intention of overhauling the entire federal criminal justice system, President Reagan on October 12, 1984 signed into law the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat. 1976, 2017 ("CCCA") (codified in multiple Titles). Title II of the CCCA, the Sentencing Reform Act of 1984 ("Act") (codified at 28 U.S.C. §§ 991–98), effects monumental changes in the way in which defendants are to be sentenced in federal courts. It is this Act which defendants now seek to have declared unconstitutional.

Perhaps the most significant feature of the Act is its creation of the Commission. The Act provides in its first section that "[t]here is established as an independent commission in the judicial branch of the United States a United States Sentencing Commission...." 28 U.S.C. § 991(a) (1982 ed., Supp. III 1985). This Commission is charged by Congress with the task of promulgating and distributing "guidelines ... for use of a sentencing court in determining the sentence to be imposed in a criminal case...." 28 U.S.C. § 994(a)(1). These Guidelines, which the Commission would establish with an eye toward a wide variety of congressionally enumerated criteria,

---

1. Because the arguments of all four defendants are substantially alike, and because all four request precisely the same relief, this decision neither distinguishes among the defendants' arguments nor attributes those arguments to particular defendants.

would produce for the first time a *range* of allowable sentences for a given defendant and a given federal crime. That is, the Act intentionally curtails the previously broad sentencing discretion of federal judges.

The Act explicitly describes the two purposes of the Commission. The first is to establish federal sentencing policies and practices that:

(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of Title 18, United States Code [*i.e.,* "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"];

(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and

(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process....

28 U.S.C. § 991(b)(1). The second stated purpose of the Commission is to "develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code." 28 U.S.C. § 991(b)(2).

These purposes bear out several crucial congressional policy judgments. First, by directing the Commission to formulate ranges of allowable sentences, Congress sought to eliminate the sometimes wide disparities that had characterized federal sentencing. *See* S.Rep. No. 225, 98th Cong., 1st Sess. 37–52 (1983) *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3220–35 ("S.Rep."). Congress understood, for example, that the *de facto* division of sentencing authority between the judiciary and the Parole Commission contributed to a nagging uncertainty about the length of time that offenders would serve in prison, thereby undermining both public confidence in the law and the law's deterrent force. *Id.* at 46–49, 1984 U.S.Code Cong. & Admin.News at 3229–32. Congress therefore found that continuation of the Parole Commission would be "entirely at odds with the rationale of the proposed guidelines system." *Id.* at 53, 1984 U.S.Code Cong. & Admin.News at 3236. Congress did not, however, mortgage fundamental fairness for uniformity or certainty of sentences. The Senate Report explained: "The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences." *Id.* at 52, 1984 U.S. Code Cong. & Admin.News at 3235. Congress also made plain the Act's subsidiary purposes of ensuring that a full range of options is available to a sentencing judge and of maintaining "consistency of purpose" in sentencing. *Id.* at 59, 1984 U.S. Code Cong. & Admin.News at 3242. Finally, through the Act Congress unmistakably sought to retreat from the "rehabilitation" model for sentencing policy, which it found to be "not an appropriate basis for sentencing decisions." *Id.* at 40, U.S.Code Cong. & Admin.News at 3223; *cf.* 18 U.S.C. § 3553(a)(2).

In addition to setting up these overarching purposes and policies, Congress also identified many of the specific factors to be considered in constructing the Guidelines. In establishing categories of *offenses*, the Commission was directed to consider, among other factors:

(1) the grade of the offense;

(2) the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;

(3) the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;

(4) the community view of the gravity of the offense;

(5) the public concern generated by the offense;

(6) the deterrent effect a particular sentence may have on the commission of the offense by others; and

(7) the current incidence of the offense in the community and in the Nation as a whole.

28 U.S.C. § 994(c). In establishing categories of *offenders,* the Commission was directed to consider, to the extent relevant, such factors as the offender's:

(1) age;

(2) education;

(3) vocational skills;

(4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;

(5) physical condition, including drug dependence;

(6) previous employment record;

(7) family ties and responsibilities;

(8) community ties;

(9) role in the offense;

(10) criminal history; and

(11) degree of dependence upon criminal activity for a livelihood.

28 U.S.C. § 994(d). Congress further mandated that the Guidelines be "entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." *Id.*

In later subsections, the Act's guidance becomes even more definite. Section 994(h), for example, provides that the Commission prescribe a sentence at or near the maximum for crimes of violence and certain narcotics-related offenses, as well as for certain repeat offenders. 28 U.S.C. § 994(h). Section 994(i) directs the Commission to ensure a "substantial term of imprisonment" for certain recidivists, pattern offenders, conspirators, and the like. 28 U.S.C. § 994(i). Conversely, the Act notes the "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense...." 28 U.S.C. § 994(j). Section 994 also discusses a variety of other situations and factors, including prison overcrowding (§ 994(g)), incremental penalties (§ 994(*l* )), and cooperating defendants (§ 994(m)). It is thus apparent that through the express terms of the Act itself Congress provided the Commission with the makings of a blueprint for the Guidelines.

The Act provides for the Commission to establish ranges of sentences, using a two-dimensional matrix of offense and offender categories (constituted in light of the factors mentioned above). Ranges were to be set in accordance with both the Act itself and "all pertinent provisions of title 18, United States Code." 28 U.S.C. § 994(b)(1). If a sentence specified by the Guidelines includes a term of imprisonment, "the maximum of the range established for such a term shall not exceed the minimum of that range by more than the greater of 25 percent or 6 months, except that, if the minimum term of the range is 30 years or more, the maximum may be life imprisonment." 28 U.S.C. § 994(b).

The Act specifies that the Commission shall consist of seven voting members, and two non-voting, *ex officio* members—the Attorney General or his or her designee and the chairman of the United States Parole Commission. The members are appointed by the President, by and with the consent of Congress, and serve six-year terms. At least three of the Commission members "shall be Federal judges selected after considering a list of six judges recommended to the President by the Judicial

Conference of the United States." 28 U.S.C. § 991(a). Not more than four of the members may belong to the same political party. The President may remove members of the Commission, but "only for neglect of duty or malfeasance in office or for other good cause shown." *Id.*

## II.

### *The Sentencing Guidelines*

The Guidelines took effect on November 1, 1987. In the introduction to its October 1987 *Guidelines Manual,* the Commission reaffirmed its nature as "an independent agency in the judicial branch." The Commission then briefly recounted its task of analyzing some 10,000 presentence reports, summary reports of some 40,000 convictions, parole guidelines, congressional policy judgments and statutes. From this abundance of diverse theoretical and empirical information, the Commission set up the categories for offenses and offenders. Offenses were grouped into 43 base levels, according to relative severity. Recommended sentences for each base level were figured, after a review of past sentencing practices. Consideration of certain aggravating and mitigating circumstances was allowed in order to take into account the gravity of a specific crime. The Commission also categorized offenders, into six groups and on the basis of their criminal history. The Commission then plotted the coordinates for offenses and offenders and produced a grid which sets out sentencing ranges. The Commission estimated that the guidelines as originally promulgated would apply to ninety percent of all cases in the federal courts (with amendments forthcoming as necessary).

## DISCUSSION

### I.

#### *Ripeness*

Before considering the merits of this motion, the court must first determine whether the defendants' claims are ripe for review. The Supreme Court has stated that the doctrine of ripeness operates "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). A ripeness inquiry encompasses an evaluation of two factors—the "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515; *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1381 (9th Cir.1986). The Ninth Circuit has found that "[a] claim is fit for decision if the issues raised are primarily legal and do not require further factual development and the challenged action is final." *Trustees for Alaska, supra,* at 1381. Ripeness is "peculiarly a question of timing," and the court therefore must "look at the facts as they exist today in evaluating whether the controversy ... is sufficiently concrete to warrant ... intervention." *Assiniboine and Sioux Tribes v. Board of Oil and Gas Conservation,* 792 F.2d 782, 788 (9th Cir.1986).

Having examined the facts as they now exist, the court finds that defendants' challenge is ripe for adjudication. The issues before the court—purely legal issues which do not require further factual development—are presently fully fit for judicial decision. In addition, substantial hardships will befall defendants if this court refuses to hear their challenge. Most immediate will be the difficulties which defendants will face in deciding whether to accept plea offers. Without a clear understanding of likely punishments, a defendant simply cannot make an informed decision about a plea offer. Finally, there is nothing to be gained from postponing consideration of defendants' challenge. The court therefore must proceed to the merits.

## II.

### *Delegation Issues*

Defendants argue that the Guidelines are unconstitutional because Congress improp-

erly delegated a portion of its lawmaking power to the Commission. Specifically, defendants allege that Congress improperly delegated its power to prescribe penalties for all crimes against the United States. Defendants propose that this delegation is unconstitutional for two reasons.

First, defendants assert that Article I of the Constitution absolutely prohibits Congress from delegating the task of fixing penalties for federal crimes. According to defendants, certain "core functions" exist in government which only Congress has the power to regulate. And although these core functions have never been listed conclusively or with precision, the case law suggests that "the more fundamental the liberty interest involved, the narrower the range of the permissible delegation." Memorandum in Support of Motion to Declare the Sentencing Guidelines Invalid (*United States v. Casarez*) ("*Casarez* Memo"), p. 32. *See Wayman v. Southard,* 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825); *J.W. Hampton, Jr., & Company v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928); *United States v. Rumely,* 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953); *United States v. Robel,* 389 U.S. 258, 275, 88 S.Ct. 419, 429, 19 L.Ed.2d 508 (1967). (Brennan, J., concurring). Moreover, "at some point, the liberty interest is so fundamental that no delegation is permissible." *Casarez* Memo, p. 32. This is such a case, say defendants, because "[t]he imposition of a criminal sanction implicates the most fundamental of liberty interests—the right to be free from incarceration." *Id.*

Alternatively, defendants submit that even if Congress could delegate its power to set penalties for federal crimes, the manner in which it has done so here is constitutionally invalid. Briefly, defendants aver that a congressional delegation of power must be limited by "intelligible principles," so that the recipient of the delegated power is not allowed unfettered discretion. Here, say defendants, Congress's failure to provide adequate guidance to the Commission in effect empowered the Commission to legislate sentencing reform at will.

■ Upon due consideration of defendants' arguments and authorities, however, the court finds that Congress did not impermissibly delegate its Article I legislative power to the Commission and that the Act therefore need not be invalidated on this ground. Defendants' first argument is unavailing for two reasons. First, there is scant authority for the proposition that some "core functions" are nondelegable. Indeed, in *Synar v. United States,* 626 F.Supp. 1374 (D.D.C.) (three-judge panel), *aff'd sub nom. Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), a three-judge panel of the District of Columbia District Court expressly rejected a *"per se* nondelegability" approach. The court stated:

> We reject this "core functions" argument for several reasons. First, plaintiffs cite no case in which the Supreme Court has held *any* legislative power, much less that over appropriations, to be nondelegable due to its "core functions" status.... Second, judicial adoption of a "core functions" analysis would be effectively standardless. No constitutional provision distinguishes between "core" and "non-core" legislative functions, so that the line would necessarily have to be drawn on the basis of the court's own perceptions of the relative importance of various legislative functions.

626 F.Supp. at 1385. This court specifically agrees with the *Synar* analysis and therefore declines to find that some "core functions" are by nature nondelegable.

■ Moreover, even if the court could acknowledge core functions, it is unlikely that sentencing would be among them. As is discussed below, the duties involved in federal sentencing traditionally have been distributed throughout all three branches of government, with Congress defining crimes and prescribing maximum sentences, judges sentencing individual offenders and the executive Parole Commission setting the dates on which offenders will be released. *See Geraghty v. United States Parole Commission,* 719 F.2d 1199 (3d Cir. 1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984). In light of

this division of duties, the constitutionality of which has never been impeached, it is impossible for the court to conclude that sentencing is strictly a legislative "core function."

■ Neither is the court persuaded by defendants' second argument—that Congress failed to set out "intelligible principles" to guide the Commission. The court is impressed at the outset by the persistent reluctance of courts to strike down allegedly standardless delegations. In fact, the Supreme Court has not declared a delegation unconstitutional since the New Deal era cases of *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (striking down a portion of the National Industrial Recovery Act), and *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (same). Moreover, these are the only two cases in which the Court has declared a statute unconstitutional by reason of undue delegation. That the nondelegability doctrine has fallen into disuse no doubt reflects the Supreme Court's belief that "[i]n an increasingly complex society Congress obviously could not perform all its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy." *Opp Cotton Mills, Inc. v. Administrator of Wage & Hour Division,* 312 U.S. 126, 145, 61 S.Ct. 524, 532, 85 L.Ed. 624 (1941), *quoted in Synar,* 626 F.Supp. at 1384.

Despite its apparently diminished applicability, however, the nondelegability doctrine remains valid law. The test for an impermissible delegation of authority was restated by the Supreme Court in *National Cable Television Association, Inc. v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 1149–50, 39 L.Ed.2d 370 (1974): "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power." Here, the court finds that Congress did set out intelligible standards and statements of purpose and that the Act therefore does not embody an unconstitutional delegation of legislative power.

The court first notes that in the Act Congress carefully outlined its sentencing philosophy. Indeed, Congress could not have been much clearer in stating that the underlying motivation for the Act was to displace disparate sentencing with certainty and fairness. 28 U.S.C. § 991(b)(1)(B). In addition, after having considered the various competing philosophies, Congress detailed the purposes for sentencing.[2] 18 U.S.C. § 3553(a); 28 U.S.C. § 991(b)(1)(A). In so doing, Congress disclosed to the Commission both the "whither?" and the "why?" of sentencing reform—the destination toward which the Guidelines should point and the reasons why that destination was chosen.

But Congress did not merely point the Commission in the right direction and then unleash it to go about its task in whatever manner it saw fit. Rather, Congress explicitly instructed the Commission on what to do (set sentence ranges) and how to do it (what factors to consider in establishing categories).[3] 28 U.S.C. § 994. Additionally, Congress offered specific directives (such as when heavy or light sentences would be appropriate) and commented on numerous other matters attendant to formulation of the Guidelines. *Id.*[4] And, of course, Congress retained for itself the

---

**2.** The mere presence of competing philosophies and policies *does not,* of itself, preclude the formulation of intelligible principles sufficient to support a delegation. *See Opp Cotton Mills, supra* (delegation was upheld even though the delegee, not Congress, assigned relative weights to factors).

**3.** Note that even if Congress had left some policy choices to the Commission, that would not necessarily amount to an unconstitutional delegation. *See Yakus v. U.S.,* 321 U.S. 414, 425–

26, 64 S.Ct. 660, 667–68, 88 L.Ed. 834 (1944) ("Congress is not confined to that method of exercising its policy which involves the least possible delegation of discretion to administrative officers."); *Synar, supra,* at 1389.

**4.** Substantial guidance on application of the section 994 factors is provided by the Senate Report, S.Rep. at 172–81, 1984 U.S.Code Cong. & Admin.News at 3355–3364.

power to fix maximum sentence lengths. In short, Congress adequately provided the Commission with intelligible principles.

A comparison with recent delegation cases verifies this conclusion.[5] In *Geraghty, supra,* the Third Circuit upheld the delegation to the Parole Commission of the power to set prisoner release dates. In *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694, *reh. denied,* 335 U.S. 836, 69 S.Ct. 11, 93 L.Ed. 389 (1948), the Supreme Court upheld a delegation of legislative power to administrative officials, where that power was accompanied by the duty to construe the arguably open-ended term "excess profits." In *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the Court permitted the Power Commission to set "just and reasonable" rates for natural gas. In *National Broadcasting Co. v. United States,* 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943), the Court rejected a claim that the "standard of 'public interest' governing the exercise of the powers delegated to the Commission by Congress is so vague and indefinite that, if it be construed as comprehensively as the words alone permit, the delegation of legislative authority is unconstitutional." *See also Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); *New York Central Securities Corp. v. United States,* 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932); *Synar, supra.* By contrast, in *Schechter Poultry* Congress directed the live poultry industry to propose, and the President to approve, "codes of fair competition." Congress failed, however, either to define "fair competition" or to provide anything other than a "wish list" of goals. 295 U.S. at 541–42, 55 S.Ct. at 848. The Court therefore found that Congress had improperly delegated its legislative power. Similarly, in *Panama Refining,* Congress failed to guide state officials or the President in deciding appropriate levels of petroleum exports. In the instant situation, however, Congress did enunciate intelligi-

ble principles. Accordingly, the court finds that the delegation of power to the Commission was constitutional.

### III.

### *Separation of Powers Issues*

Defendants further propose that the Act is unconstitutional because the Commission, as constituted, violates the principle of separation of powers. There is little need for the court to either recap the history or verify the legitimacy of our government's longstanding and guiding principle of separation of powers. A short description should suffice as an introductory:

> The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws, to the executive the duty of executing them, and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts. The general rule is that neither department may invade the province of the other and neither may control, direct, or restrain the action of the other.

*Commonwealth of Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *see also I.N.S. v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) (warning of the "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives").

To say that the branches' powers are separate, however, is not to say that they are absolutely independent. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The Supreme Court has specifically discredited the "archaic view of the separation of powers as requiring three airtight departments of government." *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). As recently explained by the Third Circuit:

---

**5.** In *Synar,* the court pointed out that "the mode of analysis applied by the Supreme Court in this field relies substantially upon factual compari-

son of the delegation under challenge with delegations previously adjudicated." 626 F.Supp. at 1384–85.

"Only if [the branches] function independently within their separate areas, but cooperatively in their relations with each other, may the government, as a whole, perform its constitutional role. Each separate gear must carry out its assigned task while meshing with the other so that power is delivered where needed." *In re President's Commission on Organized Crime (Subpoena of Scarfo),* 783 F.2d 370, 375 (3d Cir.1986) *("Scarfo ").*

Generally, a proper separation of powers inquiry "focuses on the extent to which the challenged action prevents the affected branch from accomplishing its constitutionally assigned functions." *Id.* The Supreme Court has stated: "Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon, supra,* 433 U.S. at 443, 97 S.Ct. at 2790.

Defendants assert that the Commission, in nature and role, interferes with the Constitution's apportionment of governmental functions. Defendants' several arguments in support of this assertion are examined in turn, following a preliminary discussion of the Commission's nature.

### A. *Nature of the Commission*

Before undertaking to analyze defendants' separation of powers argument, the court must address the threshold issue of the Commission's nature. That is, for purposes of a separation of powers inquiry, what exactly is the Commission?

In truth, Congress could not have been much more straightforward in designating the Commission "an independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). But it is precisely this simple-sounding designation which has allegedly exposed multiple constitutional pitfalls. Defendants assert that a judicial Commission is unconstitutional for several reasons, including that the duties of the Commission's judge members lie outside of the Constitution's Article III judicial power. The Department of Justice, formally representing the plaintiff United States, agrees in principle with defendants' assertion and therefore requests that the court salvage the Act by recharacterizing the Commission as an executive commission (which could then pass constitutional muster). The Sentencing Commission itself, however, will have none of this. Through an *amicus curiae* brief the Commission insists that Congress's designation as a judicial commission is proper and presents no insurmountable constitutional obstacles.

Having reviewed the Act in light of its purposes and intentions, the court concludes that the Commission is properly regarded as an independent commission within the judiciary. The starting point in reaching this determination is, of course, the express language of the Act itself, which unequivocally identifies the Commission as an independent judicial commission. This is language which, while not conclusive, nevertheless must be afforded the considerable deference normally owing to congressional determinations. *See Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 102, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973).

The Act's legislative history confirms the designation of the Commission as an independent commission within the judicial branch. For example, in rejecting a suggestion that the Guidelines allow the Parole Commission to continue its practice of setting some release dates, the Senate Report stated: "The better view is that sentencing should be within the province of the judiciary." S.Rep. at 54, 1984 U.S.Code Cong. & Admin.News at 3237. And in its section-by-section analysis of the Act, the Senate Report declared: "Placement of the Commission in the judicial branch is based upon the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." *Id.* at 159, 1984 U.S.Code Cong. & Admin.News at 3342.

To say that sentencing is primarily a judicial function is not to say that the establishment of sentencing policy necessar-

ily implicates the Article III judicial power, however. Congress expressly created an "independent commission"—a body that, from all appearances, would assist in the primarily judicial task of sentencing without itself exercising the judicial power.

### B. Expanded Function of the Judiciary

■ But, say defendants, it is precisely on this point that the Commission cannot have it both ways: if the Commission is established as a part of the judiciary, then it cannot engage in Guideline-making. Simply stated, that function exceeds the scope of the judicial power.

Under section 2 of Article III, the power of the federal judiciary is limited to deciding "cases" or "controversies." U.S. Const. Art. III, § 2. Federal courts, that is, interpret and apply laws in cases which are properly before them. *Mellon, supra,* 262 U.S. at 488, 43 S.Ct. at 601. Thus, the Supreme Court has invalidated statutes which it found to expand impermissibly the function of the judiciary. In *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), the Court struck down a statute which vested in the courts of appeals the power to determine pension rights of widows, orphans and invalids, subject to revision by the Secretary of War and the Congress. The Court acknowledged "[t]hat neither the Legislative nor the Executive Branches, can constitutionally assign to the Judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." *Id.* at 409. Following *Hayburn's Case,* the Supreme Court in *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1852), ruled that Congress could not delegate to an Article III court the duty to receive and adjust claims against the United States arising out of the Treaty of 1819 with Spain. And in *Muskrat v. United States,* 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911), the Court admonished lower courts to " 'carefully abstain from exercising any power that is not strictly judicial in its character, and which is not clearly confided to [them] by the Constitution.' " *Id.* at 355, 31 S.Ct. at 253, *quoting Gordon v. United States,* 117 U.S. 697, 706

(1864) (Appendix); *see also Keller v. Potomac Electric Power Co.,* 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731 (1923).

While it is true that the judicial power has always been restricted to deciding cases or controversies, however, it is not true that judges have always been precluded from doing anything other than deciding such cases or controversies. Indeed, it is well settled that Congress may authorize judges to perform tasks that aid in the performance of their judicial function. *See Wayman, supra; Chandler v. Judicial Council,* 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (not finding a constitutional infirmity in grant of authority to judicial council). In *In re Certain Complaints Under Investigation,* 783 F.2d 1488, 1505 (11th Cir.), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986), the Eleventh Circuit found in light of *Chandler* that "judges are not limited to just bench-sitting, and do not violate separation of powers principles when they participate in ancillary court management tasks." Thus Congress may, for example, create a Judicial Conference of the United States, or an Advisory Committee on the Federal Rules of Civil Procedure or a federal probation service. The constitutionality of judicial participation in these endeavors appears to be beyond dispute. *See, e.g., Chandler, supra; Sibbach v. Wilson & Co.,* 312 U.S. 1, 9–10, 61 S.Ct. 422, 424–425, 85 L.Ed. 479 (1941); 28 U.S.C. § 331. Similarly, Congress may authorize a circuit judicial council committee to subpoena documents in order to investigate allegations of misconduct on the part of a federal judge. *Certain Complaints, supra.* In *Certain Complaints,* the court stated:

> The critical point is that the investigatory tasks at issue here, including the subpoena power, have the sole purpose of exploring complaints against federal judges and magistrates, with the ultimate aim of promoting "the effective and expeditious administration of the business of the courts." Functions so limited in scope and purpose may or may not be constitutional in other respects, but they do not fall outside the ambit of duties assigna-

ble to members of the judicial rather than another branch.

783 F.2d at 1505. *See also Young v. United States ex rel. Vuitton et Fils S.A.,* —— U.S. ——, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987) (upholding judicial appointment of attorneys to prosecute criminal contempt violations, in order to ensure "that the Judiciary has a means to vindicate its own authority without complete dependence on other branches").

The constitutionality of other non-adjudicatory service by judges is not so clear cut, however. Recently, two circuit courts have heard constitutional challenges to service of judges on the President's Commission on Organized Crime. In *In re Application of President's Commission on Organized Crime (Subpoena of Scaduto),* 763 F.2d 1191 (11th Cir.1985) ("*Scaduto*"), a divided panel of the Eleventh Circuit found that the presence of one active circuit judge and retired Justice Stewart on the President's Commission did offend the constitutional requirement of separation of powers. Adopting the "functional standard" of *Nixon, supra,* the court found that the impartiality of the Commission judges was threatened in many ways by the Commission's activities. The court remarked that "[a] judge who is charged with assisting and improving enforcement efforts against organized crime must adopt a pro-government perspective which is ill-suited to his obligations to be neutral in the courtroom." *Id.* at 1197. The court therefore found that service by the judge and Justice on the President's Commission impaired the functioning of the judiciary. *Id.* at 1198.

In *Scarfo, supra,* the Third Circuit addressed the same issue and, emphasizing the *voluntary* nature of service by the judge and Justice, found that the composition of the President's Commission did not violate separation of powers. Again using the functional approach of *Nixon,* the court first found that judicial membership on the Commission did not prevent the Commission from carrying out its duties to investigate and report on organized crime in America. The court specifically noted that "[t]he Commission does not prosecute, does not indict, and does not legislate." 783

F.2d at 380. The court further found that judicial participation on the Commission did not disrupt the operation of the courts. The court acknowledged that recusals and reassignment of cases might be necessary to avoid even the appearance of conflicts of interest. But this potentiality alone did not compel a finding that the operation of the courts would be disrupted to such an extent that the Commission should be invalidated on separation of powers grounds.

Upon due consideration of the above precedents, the court finds that the Act does not unconstitutionally expand the power either of the three Article III judges who are members of the Commission or of the judicial branch as a whole. In essence, the court regards the work of the Commission to be in aid of the judicial sentencing function. This understanding proceeds initially from an examination of the Act itself and its legislative history. The unmistakable intention of Congress in enacting sentencing reform was to eliminate the "shameful disparity" in federal sentences. S.Rep. at 65, 1984 U.S.Code Cong. & Admin.News at 3248. A clear and consistent purpose underlies the Act, the Commission and the Guidelines—to eliminate disparity by setting ranges to guide judges in sentencing. In order to effectuate this limited purpose, the Act did *not* direct the Commission to establish new crimes or penalties. Nor did the Act authorize the Commission to discourse on broad issues of sentencing philosophy. Instead, the Act merely directed the Commission to synthesize congressionally mandated sentencing policy into a format which would assist judges in imposing fair and uniform sentences. This directive does not violate the constitutional principle of separation of powers.

This is not to say that the Commission's function is directly analogous to that of the various judicial rulemaking bodies which have heretofore survived constitutional challenges. The work of the Commission appears indeed to be distinguishable, and it is perhaps of its own species. But recognition of this uniqueness in no way compels the court to invalidate the Act. The test under a separation of powers inquiry is not

the wooden one of whether a given case can be analogized to prior cases. Instead, it is whether a delegation of power within the judicial branch is properly in aid of the judicial function. *Nixon, supra.* And, as mentioned above, the court finds that the Commission's power was properly exercised in furtherance of the "primarily judicial" function of sentencing.

The court's finding is not undermined by the suggestion that the Guidelines are impermissibly "substantive," whereas the various Federal Rules are more properly construed as "procedural." *See Sibbach, supra* (applying the distinction to the Rules of Civil Procedure). In addressing this suggestion, the court first notes the imprecision that necessarily attends a separation of laws or policies into "substantive" and "procedural" realms. Certainly many of the "procedural" Federal Rules rest upon "substantive" determinations; often, too, they are effectively outcome-determinative. Notwithstanding this difficulty in defining these terms, the court is inclined to find that the Guidelines are essentially procedural, even though they represent a distillation of multitudinous "substantive" concepts. Through the text of the Act and its legislative history Congress set out the relevant substance of federal sentencing law, leaving to the Commission the task of putting that substance into a form capable of aiding judges in the process of sentencing.[6] Moreover, even if the Guidelines are properly viewed as somehow "substantive," they are still in aid of the judicial function of sentencing. Finally, it is not clear what bearing the procedure/substance distinction has on the issue of separation of powers. *See* Burbank, *The Rules Enabling Act of 1934*, 130 U.Pa.L.Rev. 1015, 1028 (1982) (interpreting the distinction to apply under the Rules Enabling Act to issues of federalism, not to issues of separation of powers).

Nor is the court's finding undermined by the suggestion that the Guidelines do not aid the judicial function because their primary effect is on defendants and prisoners, and not on judges. *See Hanna v. Plummer*, 380 U.S. 460, 476, 85 S.Ct. 1136, 1146–47, 14 L.Ed.2d 8 (1965) (Harlan, J., concurring). While it might be true that offenders are affected by the Guidelines, this is so only in an indirect sense. The immediate and intended locus of the Guidelines' impact is the federal judiciary, which is charged with the duty to sentence in accordance with the Act.

Furthermore, the court's finding is not incompatible with the holdings of the *Scarfo* and *Scaduto* cases discussed above. In those cases the courts examined challenges to the service of judges on the President's Commission on Organized Crime. The President's Commission was specifically invested with the purpose of investigating (and presumably fighting) organized crime—a purpose which is difficult to characterize as other than *executive. See* Exec. Order 12435, Section 2(a), 48 Fed.Reg. 34,723 (1983); *Certain Complaints, supra,* at 1503–04. The objective of the President's Commission thus clearly lay outside of the range of judicial functions. The Sentencing Commission, by contrast, has been established in order to assist the primarily judicial task of sentencing. Therefore, unlike in *Scarfo* and *Scaduto*, the instant defendants are not challenging judicial service on a commission which clearly operates apart from the judicial branch.

■ For precisely this reason, the court finds that the Act does not impair the functioning of the judiciary. In fact, just the opposite appears to be the case. Congress created the Commission for the express purpose of *assisting* the judiciary in its sentencing function. The Commission did

---

**6.** The situation presented by this case is thus distinguishable from that in *Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446, 2453, 96 L.Ed.2d 351 (1987), in which the Supreme Court found that an amendment of Florida's sentencing guidelines was procedural. The Court described the amendment: "The 20% increase in points for sexual offenders in no wise alters the method to be followed in determining the appropriate sentence; it simply inserts a larger number into the same equation." Here, however, the Commission did precisely what had not been done in Florida—it altered the method to be followed in determining appropriate federal sentences.

not, as in *Scaduto*, assume duties that would unavoidably encourage a "law and order" bias. Placement of judges on the Commission therefore does not compromise judicial independence or impartiality.

In addition, no impairment arises out of the displacement of the three judges from their adjudicative capacities. Although the judges who serve on the Commission are no doubt prevented from discharging their Article III powers while they serve, this is not a sufficient intrusion upon the judiciary as a whole to warrant finding a functional impairment. Indeed, a contrary finding would call into question judicial service on any commission which requires a substantial time commitment. Nor will any impairment arise when judges depart the Commission and return to the bench. Any apparent residual prejudice or partiality can be avoided through recusal and reassignment of cases. Finally, although section 991(a) requires the service of three federal judges on the Commission, this provision alone does not compel a finding that such service is "involuntary." Perhaps if every judge were to refuse to serve, a separation of powers claim on this ground might be tenable. But this possibility is neither plausible nor properly before the court at this time.

C. *Expanded Function of the Executive*

■ Defendants further argue that the Act violates the principle of separation of powers by vesting in the President the power to remove members from the Commission. The Act provides that members "shall be subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C. § 991(a). Defendants propose that this removal power, coupled with the *ex officio* presence of the Attorney General's designee and the President's role in naming members of the Commission, affords the executive branch an unconstitutional measure of control over the Commission.

Defendants' argument rests principally upon the Supreme Court's recent opinion in

*Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). In *Bowsher,* the Court held that Congress could not reserve for itself the power to remove from office the Comptroller General, an executive branch officer. The Court stated: "To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws." *Id.* 106 S.Ct. at 3188. The Court continued:

> To permit an officer controlled by Congress to execute the laws would be, in essence, to permit a congressional veto. Congress could simply remove, or threaten to remove, an officer for executing the laws in any fashion found to be unsatisfactory to Congress. This kind of congressional control over the execution of the laws, *Chadha* makes clear, is constitutionally impermissible.

*Id.* at 3189. Here, argue defendants, to permit the purportedly "judicial" Commission to be controlled by the President similarly runs afoul of the Constitution.

Upon examination, however, the court finds that defendants' argument fails for several reasons. First, in no sense does the President "control" the Commission. Although members of the Commission are appointed by the President, this is done only after the President has consulted with "representatives of judges, prosecuting attorneys, defense attorneys, law enforcement officials, senior citizens, victims of crime, and others interested in the criminal justice process...." 28 U.S.C. § 991(a). Moreover, all appointments must be accomplished "by and with the advice and consent of the Senate." *Id.* The Act further specifies that the President shall appoint the three judges "after considering a list of six judges recommended ... by the Judicial Conference of the United States." *Id.* Not more than four Commission members may be from the same political party. *Id.*

Clearly, these provisions were designed by Congress to guarantee both bipartisan membership on the Commission and an active role in the selection of commissioners for all three branches of government. This

design comports with the federal government's longstanding tradition of sharing sentencing power. As discussed above, sentencing, although primarily entrusted to judges, "is not inherently or exclusively a judicial function." *Geraghty, supra,* at 1211. It was therefore both logical and consistent with prior practice for Congress to spread the selection power among all three branches of government. In so doing, Congress guarded against precisely the sort of executive dominance of the Commission that defendants now allege.

It is, however, the Act's removal provision, and not its selection provisions, to which defendants most earnestly protest. But, having considered the admittedly sparse authority on this issue, the court finds that the President's limited removal power does not render the Act unconstitutional. The court first notes that the situation presented by this case differs substantially from that in *Bowsher.* In *Bowsher,* it was beyond dispute that the Comptroller General was performing an exclusively executive function. As such, he was readily and properly shielded from the congressional removal power. The Commission, however, although formally residing within the judicial branch, is plainly and intentionally of a mixed composition. *See* 28 U.S.C. § 991(a). In addition, the Commission performs a sentencing function which has never been regarded as exclusively judicial; the sentencing prerogative generally has been divided among the branches. Thus, because the power of the President to remove members of the Commission does not infringe upon an exclusively judicial function, *Bowsher* is factually distinguishable and its broad separation of powers conclusions must be read circumspectly.

The court's finding here readily squares with its previous conclusion that the Commission performs a primarily judicial function. That is, although the Commission's work is primarily in aid of the judicial function of sentencing, the Commission itself is not an exclusively judicial entity. As mentioned at the outset of this separation of powers discussion, the prevailing approach today is to regard the lines which separate the branches as somewhat indistinct. Accordingly, the branches must function both independently and in concert with one another. *Scarfo, supra.* Thus, where the government is presented with a task as important as restructuring the criminal sentencing system, it is appropriate that the branches coordinate their efforts. This is especially true where, as with sentencing, the branches have a history of overlapping. But to allow input from all three branches in organizing sentencing procedures is not to encroach upon the judges' primary duty to impose sentences.

Finally, the President's removal power accords with the Act's description of the Commission as an "independent commission in the judicial branch." 28 U.S.C. § 991(a). In emphasizing the Commission's judicial nature, the court must not overlook its complementary *independent* nature. And it is in this "independence" that the Commission resembles the other commissions over which, for practical purposes, the President maintains removal power. Nothing in the text of the Act or its legislative history suggests that the removal power was contemplated to provide anything more than a necessary personnel management strategy. It is reasonable to suppose that Congress viewed the alternative, a full-fledged impeachment mechanism, to be too cumbersome to be practicable or desirable.

Thus, the court reemphasizes that the Commission is a unique but fully constitutional creation, exercising a function which is primarily judicial but in which all three branches must necessarily remain interested. To allow the President a limited power to remove the members of this Commission is not to do violence to the constitutional principle of separation of powers.[7]

---

7. Defendants also argue that the Act's removal provision allows a violation of Article III's prohibition against diminution of judicial salaries. Because members of the Commission are paid at the rate of *circuit* judges, if a judge were to be removed and then resume *district* court duties, this would in effect be a diminution of salary. Defendants have not cited any authority for this proposition, however. And, given that judges would in no event receive less salary after being

### D. *Improper Use of Non–Article III Judges*

 Defendants also argue that the presence of non-Article III members on the Commission violates the separation of powers maxim. Simply put, defendants aver that the Article III judicial power may only be exercised by persons who are invested with the Article III privileges of lifetime tenure and protection against salary diminution. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (striking down the statute establishing bankruptcy judgeships). Because not all members of the Commission enjoy these privileges, and because the Commission performs the judicial function of sentencing, the service of non-Article III judges on the Commission is unconstitutional.

Defendants' argument here fails because it misconstrues the function of the Commission. As mentioned above, the proper function of judges *qua* judges *is* to decide cases and controversies that arise under the Constitution and laws of the United States. But all of a judge's activities do not necessarily implicate the Article III judicial power, and the presence of judges on the Commission by itself does not reveal that the judicial power is being exercised. In fact, members of the Commission—judges and non-judges alike—do *not* decide cases or controversies and therefore do not partake of the Article III power. Accordingly, there is no constitutional requirement that the members of the Commission be endowed with the Article III privileges.[8]

### CONCLUSION

Upon due consideration of the parties' briefs and exhibits, the arguments advanced at hearing and for the reasons set forth above, the court finds that defendants' motions to strike down the Act must be denied.

---

removed than they received before joining the Commission, the court finds that defendants have not presented a cognizable claim for an Article III violation.

8. Defendants have also argued that the Act's provision for modification of the Guidelines similarly violates the requirement that the judicial power be exercised by Article III judges. Section 994(s) allows for modification of the Guidelines, upon application by a defendant and in light of changed circumstances. Defendants assert that because only judges may modify sentences, this section violates the principle of separation of powers.

What defendants overlook, however, is that section 994(s) does not provide for modification of sentences as such. Rather, it allows for modification of the Guidelines, which then must be reapplied by the sentencing judge. The Commission in no way adjudicates any claim; it does not hear arguments, decide issues of fact or law or grant relief.