### UNITED STATES of America

#### v.

### Michael W. CHAMBLESS, Louis W. Bignar, John G. Schillace.

#### Crim. A. No. 87–609.

United States District Court,
E.D. Louisiana.

March 9, 1988.

Gerry Deegan, Thomas C. Muehleck, Robert J. Boitmann, New Orleans, La., for U.S.

Virginia Schleuter, New Orleans, La., for Chambless.

Patrick Fanning, New Orleans, La., for Schillace.

Sheldon Fernandez, Harvey, La., for Bignar.

DUPLANTIER, District Judge.

## REASONS FOR JUDGMENT

Three defendants who are to be sentenced this date have moved to set aside the sentencing guidelines promulgated by the United States Sentencing Commission pursuant to 28 U.S.C. § 994(a) on the alternative grounds that the statute creating the Commission is unconstitutional and that the Commission violated its statutory mandate. After considering the memoranda of the parties and the Sentencing Commission as amicus curiae, we conclude that the statute is constitutional and that the guidelines were lawfully adopted. Accordingly, the motion is DENIED.

## I. THE STATUTORY FRAMEWORK

The Sentencing Reform Act of 1984 (Chapter II of the Comprehensive Crime Control Act of 1984, Public Law 98–473, October 12, 1984) ("the Act") effected a drastic change in the sentencing practices of the federal courts. The Act established the United States Sentencing Commission ("the Commission") as "an independent commission in the judicial branch," 28 U.S.C. § 991(a), to "establish sentencing policies and practices for the federal criminal justice system," 28 U.S.C. § 991(b). The primary function of the Commission is to issue guidelines for the determination of sentences in criminal cases.

The Commission is composed of seven voting members and two *ex officio*, nonvoting members. The voting members are appointed by the President with the advice and consent of the Senate and may be removed by the President "only for neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C. § 991(a). Three of the seven voting members must be federal judges selected from a list of six judges recommended to the President by the Judicial Conference of the United States. *Id.* Voting members presently hold full-time positions, but, after the guidelines have been in effect for six years, the positions of the voting members other than the chairman will become part-time. 28 U.S.C. § 992(c). Appointments are for six-year terms (except that the initial terms are staggered), and no voting member may serve more than two full terms. 28 U.S.C. § 992(a), (b).

The guidelines issued by the Commission limit the discretion of sentencing judges by prescribing narrow sentencing ranges within the statutorily authorized maximum (and minimum) penalties. The guideline range in a particular case is determined by characteristics of the offender and the offense. 28 U.S.C. § 994(b). A sentencing judge must impose a sentence within the range specified by the guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that prescribed." 18 U.S.C. § 3553(b). In addition, the judge must take into consideration any relevant policy statements issued by the Commission. 18 U.S.C. § 3553(a)(5). Either the government or the defendant may appeal a departure from or incorrect application of the guidelines. 18 U.S.C. § 3742.

Aside from the promulgation of guidelines and the issuance of policy statements, the Commission is charged with substantial administrative duties. The Commission

has a continuing duty to study the effectiveness of sentencing practices and to review and revise the guidelines, 28 U.S.C. §§ 991(b)(2) and 994(*o*); the Commission also has a number of reporting and recommendatory responsibilities. 28 U.S.C. §§ 994(p)–(r), (w). In addition, the Commission hears petitions from defendants seeking to modify the guidelines. 28 U.S.C. § 994(s).

## II. STANDING

■ As a threshold matter, the government contends that the defendants lack standing to challenge the guidelines unless the court initially determines that the defendants would receive heavier sentences under the guidelines (or via authorized departures) than they would receive otherwise. We find, without prematurely determining the defendants' sentences, that the defendants are proper parties to contest the validity of the guidelines.

In order to have standing, a litigant must show "some actual or threatened injury." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). A party "who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.... But '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (citations omitted) *quoting Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923).

Even if the sentences prescribed by the guidelines are not longer than those which the court would impose under pre-guidelines law, the actual time served under the new system is likely to be greater because the Sentencing Act abolished parole. Pub. L. 98–473, Title II, § 235. Moreover, under the guidelines each of the defendants faces a period of supervised release to which he would not otherwise be subject. Sentencing Guidelines § 5D3.1. Clearly, the defendants have a "personal stake" in the outcome of this matter. *Buckley v. Valeo*, 424 U.S. 1, 11, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976).

## III. CONSTITUTIONAL ISSUES

The constitutional attack is on three grounds: (1) Congress has unlawfully delegated legislative authority to the Sentencing Commission; (2) the presence of judges on the Commission violates the doctrine of separation of powers; and (3) the President's power to remove Commission members constitutes an impermissible control by the executive over the judiciary in violation of due process and the principle of separation of powers.

### A. DELEGATION

The defendants contend that Congress has unconstitutionally delegated to the Sentencing Commission its authority to fix criminal penalties. While the defendants recognize that Congress may properly delegate its authority where the delegated power is confined by an "intelligible principle" established by Congress, *see National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974), they maintain that "Congress has not provided the framework for the Commission's exercise of its critical delegated power." Defendants' memo at 35.

The Supreme Court has invalidated delegations of legislative authority to governmental bodies on only two occasions: *Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). With the exception of those cases, the Court has consistently upheld expansive delegations by Congress. *See, e.g., Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) and cases cited therein. The Supreme Court has explained that "[o]nly if ... there is an absence of standards ..., so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding

its choice of means for effecting its declared purpose." *Id.* at 426, 64 S.Ct. at 668.

The Supreme Court's failure to invoke the delegation doctrine in the more than 50 years since *Schechter* and *Panama Refining* indicates that the doctrine is of extremely limited application. *See National Cable Television v. United States Federal Communications Commission*, 415 U.S. 352, 352–53, 94 S.Ct. 1155, 1156, 39 L.Ed.2d 370 (1974) (Marshall, J. concurring and dissenting). Unless faced with a case of completely unbridled delegation, tantamount to an abdication of Congress's role as lawmaker, a court should decline to resuscitate a doctrine which has remained dormant since 1935.

■ This case certainly does not compel revival of the delegation doctrine. The Sentencing Commission has not been given free rein to do as it pleases; to the contrary, the Act provides ample detail to confine the authority delegated to the Commission. The statute outlines the policies which prompted establishment of the Commission, explains what the Commission should do and how it should do it, and sets out specific directives to govern particular situations.

The Congressional policies underlying the Act are reflected in the purposes of the Commission, as set out in the statute. First, the Commission is to set sentencing policies and practices that (1) satisfy the specified purposes of sentencing (just punishment, deterrence, incapacitation, rehabilitation), (2) avoid unwarranted sentencing disparities while maintaining flexibility, and (3) reflect advances in knowledge of human behavior. 28 U.S.C. § 991(b)(1). Second, the Commission is to "develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing." 28 U.S.C. § 991(b)(2).

In effectuating those Congressional policies, the Commission is instructed to promulgate guidelines for the determination of sentences. 28 U.S.C. § 994(a)(1). The Act specifies that the guidelines should cover decisions as to whether to impose a fine, a sentence to probation, or a prison term; the length of probation or imprisonment and the amount of fine; whether to impose a term of supervised release and the appropriate length thereof; and whether multiple sentences should run concurrently or consecutively. 28 · U.S.C. § 994(a)(1). The statute also directs the Commission to issue policy statements "regarding application of the guidelines and any other aspects of sentencing or sentence implementation that in the view of the Commission would further the purposes" of sentencing. 28 U.S.C. § 994(a)(2).

Congress has provided the Commission with explicit instructions regarding the formulation of guidelines. The statute mandates that the guidelines include sentencing ranges for each category of defendant and each category of offense. 28 U.S.C. § 994(b). The ranges are to be narrow: the maximum term of imprisonment prescribed by a range shall not exceed the minimum of the range by more than 25% or 6 months, whichever is greater. *Id.* The statute delineates a number of factors which may be considered by the Commission in categorizing offenders and offenses. 28 U.S.C. § 994(c) and (d). On the other hand, the Act requires that the guidelines be neutral with respect to race, sex, national origin, creed and socioeconomic status and provides that the guidelines should reflect the general inappropriateness of considering educational background, vocational skills, employment record, family ties and responsibilities, and community ties in recommending a term of imprisonment or in determining the length of a prison term. 28 U.S.C. §§ 994(d) and (e).

Congress did not stop there. After giving the Commission a mission and the method to carry out that mission, Congress further circumscribed the power delegated to the Commission by providing specific rules for certain situations. For instance, the Act directs that the guidelines specify a sentence at or near the maximum for adult prior offenders who commit violent crimes or certain drug offenses. 28 U.S.C. § 994(h). The guidelines are to provide a

"substantial term of imprisonment" for other delineated categories of offenders. 28 U.S.C. § 994(i). The statute further mandates that the guidelines reflect the general inappropriateness of imprisonment for first offenders who have not committed violent or otherwise serious crimes and reflect the appropriateness of imprisonment when a crime of violence results in serious bodily injury. 28 U.S.C. § 994(j). These are but a few of the specific directives included in the Act. *See also* 28 U.S.C. §§ 994(k), (*l*), (m), (n), (v).

The defendants point out a number of areas in the statute where Congress could have been more specific. However, what Congress could have done is not at issue. "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." *Yakus*, supra at 425–426, 64 S.Ct. at 668. Congress has clearly enunciated intelligible principles to guide the Commission, and that is sufficient.

## B. SERVICE OF JUDGES ON THE COMMISSION; SEPARATION OF POWERS

The defendants maintain that the presence of judges on the Commission violates the doctrine of separation of powers because members of the Commission perform non-judicial functions. In support of this contention, the defendants rely upon historical evidence that the Framers of the Constitution were determined to keep judges completely "distinct from every other avocation than that of expounding the laws. It is peculiarly dangerous to place them in a situation to be either corrupted or influenced by the executive." Defendants' memo at 14 *quoting* The Federalist Papers, No. 73 at 446–47 (Rossiter ed. 1961).

█ The principle of separation of powers is firmly embedded in the constitutional structure of our government. Yet, it is equally fundamental that the Constitution does not require "a hermetic sealing off of the three branches of Government from one another." *Buckley*, supra at 121, 96 S.Ct. at 683. As noted by Justice Jackson,

proper operation of the government necessitates both independence and coordination of the three branches:

> While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J. concurring). We cannot conclude that the presence of judges on the Commission tips the constitutional balance between separation and interdependence.

The text of the Constitution supports our conclusion that judges may constitutionally serve in extra-judicial capacities. Art. I, Sect. 6 of the Constitution expressly provides that "no person holding any office under the United States, shall be a Member of either House during his Continuance in Office." However, there is no similar provision forbidding judges from holding offices despite the fact that such a prohibition was suggested at the Constitutional Convention. Government's opposition memo at 30 *citing* M. Farrand, *The Records of the Federal Convention of 1787* (1966 ed.) II at 341–42 and R. Wheeler, "Extrajudicial Activities of the Early Supreme Court," 1973 *Sup.Ct.Rev.* 122, 129. The absence of such a provision would thus appear to be strong evidence against the defendants' argument that inclusion of judges on the Commission is unconstitutional.

There are several early Supreme Court cases dealing with the imposition of extra-judicial functions on the judiciary which likewise cut against the defendants' argument. The first is *Hayburn's Case*, 2 U.S. (2 Dal.) 409, 1 L.Ed. 436 (1792). In 1792, Congress passed an act giving the circuit courts the authority to settle pension claims, subject to revision by the Secretary of War and the Congress. The circuit court for the district of Pennsylvania refused to execute the act. Consequently, the U.S. attorney general sought a writ of

mandamus commanding the court to act on the claim of William Hayburn. The statute was amended prior to judgment, rendering the case moot. However, the opinions of the judges of three circuit courts are given in a note to the case by the reporter. Each of the courts concluded that the power conferred by the act to settle claims was not judicial and therefore could not be exercised by courts. The courts did not agree, however, as to whether the judges could settle claims individually as commissioners:

The judges in the New York Circuit, composed of Chief Justice Jay, Justice Cushing, and Duane, District Judge, held that the power could not be exercised by them as a court. '50]But in 'consideration of the meritorious and benevolent object of the law, they agreed to construe the power as conferred on them individually as commissioners, and to adjourn the court over from time to time, so as to enable them to perform the duty in the character of commissioners, and out of court.

The judges of the Pennsylvania Circuit, consisting of Wilson and Blair, Justices of the Supreme Court, and Peters, District Judge, refused to execute it altogether, upon the ground that it was conferred on them as a court, and was not a judicial power when subject to the revision of the Secretary of War and Congress.

The judges of the Circuit Court of North Carolina, composed of Iredell, Justice of the Supreme Court, and Sitgreaves, District Judge, were of opinion that the court could not execute it as a judicial power; and held it under advisement whether they might not construe the act as an appointment of the judges personally as commissioners, and perform the duty in the character of commissioners out of court, as had been agreed on by the judges of the New York Circuit.

*United States v. Ferreira,* 54 U.S. (13 How.) 43, 49–50, 14 L.Ed. 42, 49 (1851).

Two years after *Hayburn's case,* the Supreme Court decided the case of *United States v. Yale Todd* (1794). The case was not reported but is discussed by Chief Jus-

tice Taney in a note to *United States v. Ferreira,* supra. Before the amendment of the 1792 act, the judges of the circuit court for the district of Connecticut construed the act as conferring the power to settle claims on the judges as individual commissioners. In accordance with that construction of the act, judges of the court, purporting to sit as commissioners under the act, settled the claim of Yale Todd. The United States sued for the return of the pension paid to Todd. The parties agreed that, if the act authorized the judges as individuals to act as commissioners, the statute was constitutional and Todd was entitled to his pension as determined by the judges. The Supreme Court held that "as the act of Congress intended to confer the power on the courts as a judicial function, it could not be construed as an authority to the judges composing the court to exercise the power out of court in the character of commissioners." *Id.* 54 U.S. (13 How.) at 58. Thus, it seems clear that the Supreme Court proceeded on the assumption that judges as individuals can constitutionally exercise non-judicial powers.

In *United States v. Ferreira,* supra, the Court considered a statute which empowered the United States District Court for the Northern District of Florida to hear claims arising under the treaty of 1819 with Spain, subject to approval by the Secretary of the Treasury. Ferreira presented a claim to the district judge who found him entitled to an award. The government appealed to the Supreme Court. Chief Justice Taney, writing for the court, concluded that the power to rule on the claims was not judicial in nature and that, consequently, the award was not appealable. The case was therefore dismissed for lack of jurisdiction. The Court held that the act imposed the duty to settle claims on the judge as an individual, rather than on the court itself. In dicta, the Court elaborated on the constitutionality of the exercise of non-judicial power by judges individually as opposed to the exercise of such power by courts. In discussing *Hayburn's Case,* the Court said that:

the only question on which there appears to have been any difference of opinion, was whether [the act of 1792] might not be construed as conferring the power on the judges personally as commissioners. And if it would bear that construction, there seems to have been no doubt, at that time, but that they might constitutionally exercise it, and the Secretary constitutionally revise their decisions....

This law is the same in principle with the one we are now considering, with the difference only, that the act of 1792 imposed the duty on the court *eo nomine,* and not personally on the judges. In the case before us it is imposed upon the judge, and it appears from the note to the case of Hayburn, that a majority of the judges of the Supreme Court were of opinion that if the law of 1792 had conferred the power on the judges, they would have held that it was given to them personally by that description; and would have performed the duty as commissioners....

*Id.* 54 U.S. (13 How.) at 54–55.

The clear implication of these early decisions is that individual judges may exercise extra-judicial powers while courts may not. *See In the Matter of the President's Commission on Organized Crime, Subpoena of Scarfo,* 783 F.2d 370, 375 (3d Cir.1986).

Our conclusion is further supported by this country's history of extra-judicial government service by Article III judges.

John Jay served simultaneously as the first Chief Justice and Ambassador to England in 1794. A successor, Chief Justice Oliver Ellsworth was Minister to France during his term on the Court. John Marshall for a brief period was both Chief Justice and Secretary of State. Five Justices served on the Election Commission in 1877 that resolved the bitterly contested presidential election that year. A number of Justices have served on boards of arbitration to resolve boundary disputes and other claims with several countries as well as various tribunals which devoted their attention to other governmental problems outside the courts. In more recent times, Justice Owen Roberts served on the Commission to investigate the disaster at Pearl Harbor. Justice Robert Jackson was a prosecutor at the Nuremberg war crimes trial, and Chief Justice Earl Warren presided over the Commission investigating the assassination of President Kennedy. *Id.* at 377 (footnote omitted).

We consider the long-standing practice of extra-judicial service by judges, particularly by some of the leaders of the early Republic, to be "contemporaneous and weighty evidence" of the meaning of the Constitution. *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3187, 92 L.Ed.2d 583.

In *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court set forth the following "functional" separation of powers test:

in determining whether [an] Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive [or Judicial] Branch from accomplishing its constitutionally assigned functions.... Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Id.* at 443, 97 S.Ct. at 1790 (citations omitted). The defendants contend that, even if the presence of judges on the Commission survives an historical separation of powers analysis, the Sentencing Act is constitutionally invalid under the *Nixon* analysis because service on the Commission by judges impermissibly impairs the functioning of the judiciary. The defendants argue that service of judges on the Commission impairs the functioning of the judiciary in three respects. We disagree. We note incidentally that the Sentencing Commission was established in 1984, and yet the defendants do not present any empirical evidence which suggests that the functioning of the judiciary has been appreciably impaired.

First, the defendants note that, by issuing guidelines and policy statements, the judges who serve on the Commission will have formed and published their views on issues that will arise in litigation. As a result, the defendants contend that those judges could not act as impartial adjudicators. Defendants overstate the problem. We agree with the Commission's view that because it "is not charged with assisting or cooperating with the executive branch in investigation or enforcement of the criminal laws[,] [s]ervice on the commission does not entangle its members in the agenda of the executive branch." Sentencing Commission's Amicus Curiae Brief at 22. Thus, there is no risk of partiality. Neither does publication of the judges' views impact on impartiality. The mere fact that a judge has taken a public stand on an issue about sentencing does not make him partial to one side or the other. In addition, even if the judges who serve on the Commission could not be impartial, recusal provides a simple solution.

The defendants' second argument is that recusal would interfere with the work of the courts. However, recusal of commissioners would more than likely result in a re-shuffling of cases, not in an increased load for the non-commissioner judges. Moreover, "this argument goes to the issue of desireability and fairness to the other judges who must bear an extra load. It does not ... rise to the stature of an obstacle impeding the courts' ability to discharge their Article III obligations." *Scarfo*, supra at 381.

Finally, the defendants contend that the impartiality of the entire judiciary will be adversely affected by the service of judges on the Sentencing Commission. Defendants argue that "[a]pproval of the guidelines and preparation of the commentary and policy statements by three judges whose membership is supported by the Judicial Conference chaired by the Chief Justice makes it unlikely that other judges will fairly evaluate the claims of parties concerning the guidelines or their interpretation. The approval of the guidelines by three judges who have been recommended by the Chief Justice and the conference

puts their imprimatur on the guidelines." The most charitable response to this argument is that it is patently meritless. It is no secret that judges disagree with each other constantly. In construing or applying the guidelines, federal judges are unlikely to be impressed, or even minimally affected, by the fact that other judges serve on the Sentencing Commission.

## C. PRESIDENT'S REMOVAL POWER

The defendants' final constitutional argument is that the President's power to remove Commission members constitutes an impermissible control by the executive over the judiciary in violation of due process and separation of powers. The defendants do not clearly distinguish between the due process argument and the separation of powers argument. Nevertheless, we treat the arguments separately.

### DUE PROCESS

The defendants begin with the basic proposition that courts must be neutral and impartial. "[C]ontrol, apparent control, or improper influence over judicial functions by the executive ... impairs the neutrality of the courts and violates due process." Defendants' memo at 23. Because "Congress has transferred the *traditional judicial function of determining criminal sanctions* to the Commission[,] ... the Commission must be assured of independence from the executive, just as courts are independent of the executive." *Id.* at 28 (emphasis added). In essence, the defendants contend that the presidential removal power constitutes prosecutorial control over the adjudicator.

■ This argument is unconvincing. The cases cited by the defendants concern prosecutorial influence or control over adjudicative functions. It is clear, however, that the work of the Commission is *executive* in nature, rather than judicial. Article III of the Constitution limits the judicial power to the resolution of cases and controversies. *Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). On the other hand, "[i]nterpreting a law

enacted by Congress to implement the legislative mandate is the very essence of 'execution of the law'" *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 3192, 92 L.Ed.2d 583 (1986).

Defendants argue that sentencing is inherently a judicial function. However, there is no basis for such a proposition. "In the early days of the Republic, ... the period of incarceration was generally prescribed with specificity by the legislature. Each crime had its defined punishment." *United States v. Grayson,* 438 U.S. 41, 45, 98 S.Ct. 1616, 2613, 57 L.Ed.2d 582 (1978). Moreover, the Supreme Court has specifically held that "defining crimes and fixing penalties are legislative, not judicial, functions." *United States v. Evans,* 333 U.S. 483, 68 S.Ct. 634, 636, 92 L.Ed. 823 (1948). Congress has chosen to delegate its legislative power to issue sentencing guidelines to the Sentencing Commission; the exercise of that delegated authority in rulemaking is an executive, not judicial, function. *See I.N.S. v. Chadha,* 462 U.S. 919, 953 n. 16, 103 S.Ct. 2764, 2765 n. 16, 77 L.Ed.2d 317 (1983).

A recent Fifth Circuit case makes clear that executive control over the setting of criminal penalties is not unconstitutional. In *United States v. Gordon,* 580 F.2d 827 (5th Cir.1978), the defendant challenged the constitutionality of the Comprehensive Drug Abuse Prevention and Control Act of 1970. The Act gave the Attorney General the authority to schedule, re-schedule, and de-schedule drugs. In essence, the Attorney General was given the authority to determine which drugs are legal and what penalties will be imposed for unlawful manufacture, distribution, and possession of illegal drugs. The Attorney General's authority under the Act was in turn delegated to the Drug Enforcement Administration. The defendant argued that the delegation of the power to schedule drugs "to the very body responsible for enforcement of the Act ... is inherently unfair." *Id.* at 840. Focusing upon the defendant's delegation argument, the Fifth Circuit found the delegation to be proper. Then, turning to the fairness/separation of powers argu-

ment, without detailed discussion, the court found no constitutional infirmity. *Id.*

In this case, the executive's control over sentencing is limited to the President's power to remove members of the Commission. This limited control pales in comparison to the executive's direct authority to schedule drugs upheld in *Gordon.* *Gordon* thus supports our conclusion that the President's removal power does not amount to a violation of due process.

## SEPARATION OF POWERS

The defendants' objection to the removal provision is primarily based on a due process analysis. However, there is a separation of powers argument implicit in the defendants' discussion of the removal issue. In particular, *Bowsher v. Synar,* supra, on which defendants heavily rely, is not a due process case but is rather a separation of powers case.

In *Bowsher,* the Supreme Court held that certain portions of the Gramm–Rudman–Hollings Act violated the doctrine of separation of powers. The Act placed the responsibility for executing the Act in the hands of the Comptroller General. The court found this provision to be unconstitutional.

> To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws.... The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess.

106 S.Ct. at 3188. The Court rejected the argument that the Comptroller General was not subservient to Congress. "As the District Court observed, 'Once an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey'" *Id.* The Court noted that "Congress could simply remove, or threaten to remove, an officer for executing the laws in any fashion found to be unsatisfactory to Congress." *Id.* at 3189. Thus *Bowsher* stands

for two things: (1) power to remove constitutes power to control, and (2) it is unconstitutional for Congress to delegate executive duties to an officer controlled by Congress.

The defendants contend that, under the reasoning in *Bowsher*, the President's power to remove members of the Commission violates the doctrine of separation of powers because the executive is thereby given control over the judiciary. We do not agree.

The court's reasoning in *Bowsher* points to the conclusion that the presidential removal provision is constitutionally permissible (if not required). In *Bowsher*, the Supreme Court adopted a functional analysis: because the functions delegated to the Comptroller General were executive in nature, they could not be controlled by Congress. Consequently, in assessing the constitutionality of the President's power to remove members of the Sentencing Commission, we look to the functions performed by the Commission. While the Commission is situated in the judicial branch, the duties imposed on the Commission are, as previously discussed, executive in nature. Hence the removal power is properly vested in the Chief Executive.

The fact that the Commission is located in the judicial branch does not change the above analysis. In *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), the Supreme Court held that Congress had the authority to limit the President's removal power over members of the Federal Trade Commission. Because the FTC was created to be completely independent of the executive, Congress was free to limit the President's removal power. The commission was found to be "wholly disconnected from the executive department" and "an agency of the legislative and judicial departments." *Id.* at 630, 55 S.Ct. 875, and yet it was undisputed that the President could have removed FTC members for cause, as provided by Congress. The only question was whether Congress could constitutionally limit the President's removal power or whether the President had the inherent authority to remove FTC commissioners at will. Implicit in the court's opinion is a recognition that, if authorized by Congress, the President may remove members of independent commissions outside of the executive branch.

## IV. STATUTORY ISSUE

The defendants make two statutory claims, the first of which is that the sentencing guidelines are invalid because they are inconsistant with the Sentencing Reform Act in a number of respects. For instance, the defendants challenge the requirement that a term of supervised release be imposed in all felony cases; defendants assert that Congress intended that the decision whether to impose a term of supervised release be left to the discretion of the sentencing judge. Detailed discussion of these contentions is unnecessary. Suffice it to say that we do not find that the guidelines are in any manner contrary to the enabling statute.

The defendants' second statutory attack concerns the effective date of the guidelines. Pub.L. 98–473, Title II, §§ 235(a)(1)(B)(ii)(I) & (III) provide that the sentencing guidelines will not go into effect until six months after the guidelines and a report by the Sentencing Commission have been submitted to Congress. In addition, the guidelines are not effective unless the General Accounting Office submits a report to Congress within 150 days of submission of the guidelines and the Commission's report. *Id.* at § 235(a)(1)(B)(ii)(II).

The defendants maintain that the guidelines should not have taken effect on November 1, 1987, because the Commission's supplemental report was not timely because Congress did not have six months to review the report by the GAO before November, and because the GAO report was not "adequate." There is no dispute that the guidelines and the Commission's initial report were timely provided to Congress. It is also undisputed that the GAO report was submitted within 150 days of the submission of the guidelines. Under the statute, these submissions suffice to trigger the November 1, 1987, effective date. We

express no opinion as to the "adequacy" of the GAO report. The GAO reported to Congress as required; it is for Congress to decide if the report is "adequate".