**UNITED STATES of America**

v.

**Maurice F. ALVES.**

**UNITED STATES of America**

v.

**Paul W. LADD.**

**Crim. A. Nos. 88–11–MA, 87–341–MA.**

United States District Court,
D. Massachusetts.

May 3, 1988.

Robert Richman, Federal Defender's Office, Boston, Mass., for Alves.

Martin F. Murphy, Boston, Mass., for U.S.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The defendants in the above captioned cases have filed essentially similar motions to declare the Sentencing Reform Act, 28 U.S.C. § 991 *et seq.* unconstitutional, and the sentencing guidelines promulgated under it invalid and inapplicable to their cases. The defendant, Alves, was charged with five counts of bank robbery, each allegedly occurring after November 1, 1987. If convicted, Alves will be subject to the sentencing guidelines. The defendant, Ladd, was convicted after jury trial of one count of receiving counterfeit United States notes, also occurring after November 1, 1987. He was sentenced subject to sentencing guidelines on April 21, 1988.

The defendants have filed memoranda supporting their motions. The government has filed an opposing memorandum and the United States Sentencing Commission, noting its differences with the government on the issue of its validity under separation of powers principles, has filed a brief as *amicus curiae.* Because the positions of the defendants are essentially the same in both cases, I address both motions in this single memorandum.[1]

### I.

The defendants' arguments that the SRA is unconstitutional can be summarized concisely. First, they argue that the separation of powers doctrine is violated because Congress has impermissibly expanded the judicial function by assigning to the judiciary the non-judicial function of establishing sweeping and binding sentencing guidelines applicable to *all* federal criminal defendants. Secondly, membership of Article III judges on the Commission violates the separation of powers doctrine in three ways: it threatens the independence and impartiality of the judiciary by the service on a full time agency charged with policy making responsibilities, thus creating a

permanent working relationship between the executive and judiciary; it subjects each judge on the Commission to recusal; and its inclusion of Article III judges on the Commission puts a judicial imprimatur of approval on the guidelines. Thirdly, the separation of powers doctrine is violated because the President's power to appoint and remove Commission members renders the judiciary subservient to the executive. Fourthly, the SRA is the result of an unconstitutional delegation of powers because it assigns the legislative responsibility to determine appropriate penalties for federal crimes to an agency located within the judicial branch. Lastly, the mechanical sentencing procedure of the SRA violates due process because it restricts the right of the judge to individualize sentences and deprives the defendant of the right to present facts and influence the judge's assessment of an appropriate sentence.

In opposition, the government takes the position that although Congress established the Commission as an independent agency in the judicial branch, the Commission has all the attributes of an executive agency, exercising executive functions. Thus, the government concedes that if the Commission is located within the judicial branch, "potentially serious constitutional problems would be raised, namely an apparent violation of Article III and separation of powers principles." However, the Commission and the guidelines are salvageable, the government submits, if the Court ignores the incorrect and inoperative label that Congress has attached to the Commission and simply views it as an executive agency to which Congress could unquestionably delegate the power to establish sentencing guidelines under intelligible principles. With the offensive label severed from the statute, the defendants will have no complaint.[2] Alternatively, the

---

1. The defendant, Ladd, presents an additional ground, namely, that the procedure in guideline sentencing violates due process because it restricts the defendant's right to present evidence and challenge the basis of his sentence.

2. It is unclear to me how this simple transfer solves the separation of powers issue. The placing of the Commission in the executive branch would subject it to some of the same challenges it faces now.

government argues that the Commission should be viewed as an independent agency within the executive branch, like the Federal Trade Commission or the Securities and Exchange Commission, and, thus, should be considered a constitutionally established agency.

In its *amicus* brief, the Sentencing Commission concedes nothing. It argues that Congress validly delegated the specialized function of devising sentencing guidelines to the independent Sentencing Commission within the judicial branch. The service of Article III judges as voluntary, non-adjudicative commissioners does not impair or threaten judicial independence, the Commission argues. Nor does the President's removal power impair the duty of the judiciary in carrying out its constitutional duty of deciding cases and controversies. In its parting effort, the *amicus* acknowledges the position of the government that were this Court to conclude the Commission could not be located constitutionally within the judicial branch, the guidelines could be saved if the Commission were viewed as an independent agency that is *outside* the judicial branch for separation of powers purposes and *inside* the judicial branch for those statutory and administrative purposes ancillary to the judicial function. Thus bifurcated, the SRA would not be constitutionally objectionable.

These same issues, in various forms, have been presented in ever growing numbers to the district courts with divided results. Although I am adding to the growing number of opinions, it is not my intention to rehash positions which have been carefully and thoughtfully explored by other judges on both sides. Indeed, I am in substantial agreement with the conclusions reached by Judge William Enright in *United States v. Ruiz–Villaneuva*, 680 F.Supp. 1411 (S.D.Cal.1988) and Judge Adrian Duplantier in *United States v. Chambless*, 680 F.Supp. 793 (E.D.La.1988). I write to focus again on the matters raised in these motions and to press an analysis of the separation of powers issue in terms of the challenge presented, namely, the power of Congress to address comprehensively the growing and intractable problem of unfair disparity in sentencing with legislation compatible with constitutional principles.

That analysis must start with an understanding of the background of the SRA and, more particularly, the Sentencing Commission—its purpose, its composition, its operation and its product. Finally, the impact on the three branches, and specifically, the impact on the most affected branch—the judiciary—must be evaluated.

## II.

On October 12, 1984, the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat. 1837, 2017, was enacted into law. A portion of that Act, the Sentencing Reform Act of 1984 (codified at 28 U.S.C. §§ 991–98) (hereinafter the "SRA"), was the culmination of years of legislative efforts to reform the federal criminal sentencing system. Since it established sentencing institutes in 1958, 28 U.S.C. § 334(a), Congress has attempted to eliminate disparity in sentencing and promote a more fair and just order of criminal punishment. Prior to the promulgation of the guidelines, the authority to define criminal conduct and determine the range of punishment for that conduct vested solely in Congress, but the ultimate sentence to be imposed was left to the discretion of the sentencing judge. *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). The sentence imposed, however, was subject to later modification by release on parole. The parole commission, established within the executive branch, could establish the release date and, thereby, the length of the sentence. Thus, all three branches participated in the process which produced unwarranted disparity and uncertainty. *Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 1083–84, 93 L.Ed. 1337 (1949), *reh. denied*, 337 U.S. 961, 69 S.Ct. 1529, 93 L.Ed. 1760 (1949), *reh. denied*, 338 U.S. 841, 70 S.Ct. 34, 94 L.Ed. 514 (1949); *United States v. Addonizio*, 442 U.S. 178, 188–189, 99 S.Ct. 2235, 2242, 60 L.Ed.2d 805 (1979).

In enacting the SRA, Congress provided clear direction. Its intention was to limit the discretion of judges by requiring the

imposition of determinate sentences within guideline ranges. Congress sought to promote the dual purpose of uniformity and fairness, and still carry out the recognized purposes of sentences, namely punishment, deterrence, public protection and rehabilitation. Finally, sentences were subjected to appellate review under certain circumstances.

The key provision in the SRA was the establishment of the United States Sentencing Commission as "an independent commission in the judicial branch of the United States...." 28 U.S.C. § 991(a). Its membership consisted of seven voting members, three of whom were to be Article III judges selected from a panel of six nominated by the Judicial Conference. The members are chosen by the President, subject to confirmation by the Senate, for service of a six year term. They are removable by the President for neglect of duty, malfeasance in office or for other good cause shown. The primary function of the Sentencing Commission was to designate sentencing guidelines. Congress directed the Commission to follow the purposes and policies set out by Congress, particularly the elimination of unwarranted sentencing disparity and the establishment of fairness and certainty in sentencing. 28 U.S.C. § 991(b)(1)(B), 28 U.S.C. § 994(a) through (n). The Commission has the continuing responsibility to review guidelines regularly and submit amendments to Congress which would take effect within 180 days unless Congress otherwise provides. Finally, the Commission was given research, reporting and training functions, functions it was to carry out in cooperation with the Federal Judicial Center and the Administrative Office of the United States Courts.

The responsibility for the composition of the Commission was shared by the three branches of government. Its experienced and diverse membership, including the two non-voting members, reflected the different components of the criminal justice system. The selection process also was shared among the three branches, thus accommodating the concerns, policies and responsibilities of all three branches. At the same time, the sharing of the responsibility for the composition and the selection of the Commission insured that it would remain free from the influences of the more politically attuned branches—the executive and legislative.

The Commission studied over 10,000 presentence investigations, held public hearings, called for comment, and continually revised its approaches in an endeavor to draft guidelines that reflect existing sentencing practice to the extent possible. Its objective was to produce a rational, coherent system which structured judicial discretion but did not eliminate it.

The question for the purposes of these motions is not whether the Commission succeeded, but whether the means used to create the Commission disrupted the constitutional scheme. It is against this statutory framework and the history underlying it that I turn to the specific issues.

### III. *Separation of Powers*

The argument presented by the defendants in this area rests, I believe, on an overly restrictive view of the concept of the separation of powers among the coordinate branches of government. I believe it is possible to strike an appropriate balance in conducting the analysis of this issue, having in mind fidelity to cherished constitutional principles and the need to view those principles in the light of ever-changing demands imposed by the problem of unfair disparity in sentencing. This tension is nowhere posited so clearly as it is in this matter where Congress has focused on the entrenched problem of disparate sentencing in the federal courts. It has attempted to do so through a new governmental structure that combines elements of the three branches. The question here is whether Congress' efforts represent a threat to the constitutional structure so potentially lethal as to require overturning the SRA. The answer is not readily apparent. Considering whether an act of Congress which took years of diligent bipartisan effort to create should be overturned as contravening constitutional principles "is the greatest and most delicate duty that this Court is called on to perform." *Blod-*

*gett v. Holden*, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1928). Yet, it is the duty of this Court to "lay the article of the Constitution which is involved beside the statute which is challenged and to decide whether the latter squares with the former." *United States v. Butler*, 297 U.S. 1, 62, 56 S.Ct. 312, 318, 80 L.Ed. 477 (1935).

The review starts with the recognition that major adjustments in governmental structure for which there is no constitutional sanction have been accepted in response to increased demands placed upon the government. Indeed, the very development of a huge administrative bureaucracy "which combine functions characteristically associated with two or more of the departments of government demonstrates the potential for legitimate interaction or interdependence among the powers of government" that have been accepted by the Courts without an explicit constitutional imprimatur. *In Re Application of the President's Commission on Organized Crime, Subpoena of Lorenzo Scaduto ("Scaduto")*, 763 F.2d 1191, 1195 (11th Cir. 1985). Both commentators and courts alike have long recognized the need for an adaptable approach to considering these issues, an approach that reflects the understanding that the distinct roles each of the branches of government is to play are not absolute codes of conduct, but rather are general guides in exercising power. As one commentator aptly explained:

> The United States government does not operate and never has operated under a theory that legislative, executive, and judicial powers must be kept separate and can never be mixed up together. From the beginning, each branch has exercised all three kinds of powers ... Executive power is not "separated" from judicial and legislative power, legislative power is not "separated" from executive and judicial power, and judicial power is not "separated" from legislative and executive power. The three kinds of powers are commonly blended. All three kinds of powers ... are often poured together, and the resulting variable mixtures can be found in each of the three branches of government ...

> Even though the three kinds of powers are commonly blended within each of the three branches, the affirmative reality of the theory of separation of powers is that the main judicial power is in the courts, the main executive power is in the President and those under him, and the main legislative power is in Congress.

K. Davis, 1 *Administrative Law* § 2:2 (1978).

There is ample precedent to support this view of the operation of government. As the Third Circuit wrote, "[t]he Constitution does not contemplate that the three branches of government shall exist in hermetically-sealed compartments, uncooperative with, and oblivious to the activities of others. The people of this country would be ill-served by such an unrealistic dogma. The protection from abuse of power which the separation concept seeks to provide is not compromised by a necessary degree of cooperation between the three branches." *In the Matter of the President's Commission on Organized Crime, Subpoena of Scarfo ("Scarfo")*, 783 F.2d 370, 378–9 (3rd Cir.1986) (citation omitted) (footnote omitted). The Supreme Court, too, has recognized the fluidity of the concept of the separation of powers, and the practical necessity for flexibility in the structure of government:

> it is ... clear from the provisions of the Constitution itself, and from the Federalist Papers, that the Constitution by no means contemplates total separation of each of these three essential branches of Government.... The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.

*Buckley v. Valeo*, 424 U.S. 1, 121, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1974) (*per curiam*).

The flexible approach adopted by the Supreme Court for analyzing separation of powers issues reflects its understanding of the need to allow for the evolution of the structure of our government within the bounds established by the Constitution. The Court articulated the touchstone for testing the limits of the principle of separation of powers in *Nixon v. Administrator of General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1976), in which the Court wrote:

> we ... find that appellant's argument rests upon an "archaic view of the separation of powers as requiring three airtight departments of government." Rather, in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents [one branch] from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

(Citations omitted).

At the same time, the Supreme Court has long warned that the expansion of power of the judicial branch over another "should be watched with vigilance ... and should receive the most careful scrutiny." *Kilbourn v. Thompson*, 103 U.S. (13 Otto) 168, 192, 26 L.Ed. 377 (1880). The accumulation of all powers in the same hands was inimical to the preservation of liberty. *See generally Immigration and Naturalization Service v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). More recently the Supreme Court struck down a provision in the Gramm–Rudman Act which authorized the removal by Congress of the Controller General for good reason. *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3189, 92 L.Ed.2d 583 (1986). The effect of that provision, the Court reasoned, "would in practical terms reserve in Congress control over the execution of the laws.... This kind of congressional control.... is constitutionally impermissible." *Id.* at 3188–89. *See also In Re Sealed Case*, 838 F.2d 476 (D.C.Cir.1988), *pub. juris. noted,*

*sub nom. Morrison v. Olson*, —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988).

It is against this backdrop that this issue is examined. How is the neutrality of the judiciary affected? To what extent does the Commission prevent the affected branch—the judiciary—from accomplishing its constitutionally assigned function? Is there opportunity for full and vigorous debate and are there adequate checks on the exercise of governmental power by each of the three branches?

### A. Expanding the Function of the Judiciary

The defendants claim the SRA assigns the judicial branch a function that is inherently non-judicial and expands the judicial powers as defined in the Constitution. The functions of the Commission range far beyond ancillary matters properly seen as part of the judicial function, the argument continues.

Congress' primary intention in placing the Commission in the judicial branch was to insure that "sentencing should remain primarily a judicial function." S.Rep. No. 225, 98th Cong., 1st Sess. 159 (1983), U.S. Code Cong. & Admin.News 1984, pp. 3182, 3342. There may also have been a practical reason for placing the Commission in the judicial branch. The Commission had additional functions, such as to monitor guideline sentencing practices, collect and analyze data, conduct research and conduct educational programs. Congress directed the Commission to carry out these functions in cooperation with the Federal Judicial Center and the Administrative Office of the United States Courts, both of which are also located within the judicial branch and both of which were created by Congress as necessary and proper supportive agencies to assist in the performance of the judicial function.

Since early on, Article III courts have been authorized to promulgate rules affecting their administration, procedures and operations. The delegation of such rule-making powers to the judiciary by Congress is constitutional. *Sibbach v. Wilson & Co.,*

*Inc.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), *reh. denied*, 312 U.S. 713 (1941). In *Sibbach*, 312 U.S. at 14, 61 S.Ct. at 426, the court endorsed "the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress."

I believe the Commission fits within these standards. Its mandate was to assist federal judges in sentencing by producing a federal sentencing system which was rational, provided certainty, and reduced unwarranted disparity. The guidelines regulate the judicial function of sentencing, they do not abolish it. Establishing sentencing guidelines, then, is not an exclusively executive function, as was the function of the Comptroller General in *Bowsher*. The issue in *Bowsher* was whether Congress had impermissibly extended its control over an executive function. Assigning judges to promulgate rules, pursuant to Congress' direction, to guide federal judges in their sentencing discretion does not expand the judicial function. It recognizes the relationship between the branches, the roles each play in the sentencing process and the need for the participation of the judiciary to provide against the domination of one branch over another.

### B. *The Service of Article III Judges on the Sentencing Commission Impairs the Judicial Function.*

■ The defendants claim the presence of Article III judges on the Commission impairs the judicial function in three ways: it intermingles the judicial and executive function; it requires the recusal of individual judges; and it provides an imprimatur of judicial approval.

First it must be noted that only three judges, out of over 900 circuit and district judges in the active and senior status service at any one time, are eligible to serve on the Commission. They serve as commissioners, not judges. They perform non-adjudicative duties and derive their power from their appointment solely as commissioners. "Simply put: the judges do not wear their robes in the Commission room."

*Scaduto*, 763 F.2d at 1204 (Roney, Circuit Judge, concurring).

It has long been held that "Congress may impose some extrajudicial duties on Article III judges individually—duties that under the separation of powers doctrine may not be imposed on the courts *qua* courts." *Scarfo*, 783 F.2d at 375, *discussing United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1851). Thus, where individual judges voluntarily accept an extrajudicial appointment that serves a non-judicial purpose, there is no conflict with the constitution. *Id.*, at 376 (noting the importance of the non-judicial nature and voluntary acceptance by Article III judges of extra-judicial appointments in determining the constitutionality of such appointments).

Historical examples for the constitutional propriety of judges performing non-judicial tasks are many. In recent years, for example, Justice Robert Jackson served as a prosecutor in the Nuremberg trials, and Chief Justice Earl Warren served as the chairman of the commission investigating the Kennedy assassination. More commonly, Article III judges participate in the Judicial Conference, the Judicial Councils, the Administrative Office, and the Probation Office, none of which is directly involved with the function of deciding actual cases or controversies, but all of which are in support of or related to that function.

In this matter, the participation of judges in the drafting of sentencing guidelines is particularly appropriate. The Commission is charged with establishing standards designed to regulate the federal sentencing function. Congress concluded that a Sentencing Commission composed entirely of judges or controlled by the judiciary was inappropriate. S.Rep. No. 235 at 64, U.S. Code Cong. & Admin.News 1984, p. 3247. Rather it required that all three branches of government were to participate in the selection of the members of the Commission. This solution merged the experience of the realities of federal criminal prosecution and sentencing with the deliberative policy choices made by Congress. *See Scarfo*, 783 F.2d at 378 ("In the field of

judicial administration, for instance, judges possess special knowledge. To put aside that expertise when legislation is being considered would be wasteful and counterproductive"). It permitted Congress to exercise its role of setting sentencing policy while not controlling the sentencing function to the exclusion of the judicial branch.

The concern that by including judges on the Commission, a permanent working relationship between the executive and the judicial will be established that will undercut the independence of the judges on the Commission overstates the actual impact that service on the Commission and the President's power over it has had and will have on the judiciary. As has been noted, the judges serving on the Commission are voluntary participants. Although it is true that the President retains a power to remove them, the same power he may exercise over other commissioners, that is irrelevant to the function of the judiciary in performing its constitutionally mandated tasks of deciding cases. The power of the President over the judge-commissioners extends over them only in their role as commissioners; the President has no power to affect them in their role as judges. Moreover, the implicit fear that the President will be in a position to use this power to affect the conduct of the judge-commissioners in their role as Article III judges is remote. The judge-commissioners have been involved in the drafting of sentencing guidelines up to this point; future judge-commissioners will be involved in the evolution of the guidelines. The task of developing these standards, although obviously *related* to the functions of passing sentence, is clearly far removed from the actual task of sentencing any particular defendant. In short, although the President may have some strictly delineated power to remove the Commissioners, he has no power over the judges when they act in *applying* those guidelines in any particular case.

Nor will the participation of judges on the Commission taint the objectivity of the judge-commissioners in exercising their powers of passing sentence. Unlike the situation presented in *Scaduto*, 763 F.2d at 1197, in which the Eleventh Circuit found that service by members of the judiciary on the President's Commission on Organized Crime threatened the impartiality of the judiciary in hearing cases involving organized crime figures, no such taint is possible here. A judge hearing a criminal case merely applies the guidelines that have been devised by the Commission. The fact that he served on the Commission cannot possibly affect *how* he applies a mandatory guideline, nor could it affect how he conducts the trial of the case, a process several steps removed from the application of the guidelines to determine the appropriate sentence. In short, although the participation of judges on *some* types of extra-judicial agencies may possess some ability to affect the impartiality of particular judges, service on the Commission does not carry that risk. *See also Scarfo*, 783 F.2d at 375.

Finally, the potential for disruption in assigned functions is remote. There is little chance that the judiciary as a whole will be impaired even if the judge-commissioners will have to recuse themselves from specific cases. And even though other judges will serve on the Commission, and may have to recuse themselves in some cases, the easy ability to transfer cases among judges minimizes the impact of any such adjustments.

More important than the lack of disruption in the judiciary posed by the structure of the Commission is the need for a joint approach among the three branches in this particular area. As the Third Circuit made clear, "sentencing is not inherently or exclusively a judicial function. The legislature can limit the judiciary's authority to impose a probationary sentence, require that a mandatory term of years be imposed, or preclude a rehabilitative sentencing option. Circumscribing the judiciary's authority as to what length of imprisonment may be imposed has been found to be proper invasion of that branch's authority." *Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1211 (3d Cir.1983) (citations omitted), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984). And as the Supreme Court has noted, the

overlap among the three branches in the sentencing area is marked:

> [T]oday the extent of a federal prisoner's confinement is initially determined by the sentencing judge, who selects a term within an often broad, congressionally prescribed range; release on parole is then available on review by the United States Parole Commission [an executive branch body] which, as a general rule, may conditionally release a prisoner any time after he serves one-third of the judicially fixed term.

*United States v. Grayson*, 438 U.S. 41, 47, 98 S.Ct. 2610, 2614, 57 L.Ed.2d 582 (1978) (citation omitted) (footnote omitted), *quoted in Geraghty*, 719 F.2d at 1211.

## IV. *Delegation of Powers*

The defendants assert that Congress unconstitutionally delegated a legislative task to the Commission when it assigned to it the function of establishing sentencing guidelines for federal crimes. There are two prongs to the defendants' attack. First, they argue that in delegating the power to establish sentences for federal crimes, Congress has abandoned a "core function" assigned to the legislative branch "because the work of the Commission directly affects one of the most fundamental liberty interests," that of avoiding incarceration. Second, even if the task of creating sentencing guidelines could constitutionally be delegated, the defendants assert that Congress has nevertheless impermissibly delegated it because it has provided inadequate standards to direct the work of the Commission. On this record, I find that neither of these arguments has merit.

■ The Constitution does not distinguish between the functions assigned to Congress. There is thus no delineation between what the defendant assumes are "core" functions, which Congress must itself perform, and "non-core" functions, which are evidently delegable under the defendants' understanding. The absence of such a distinction was discussed in detail by a three judge panel of the District Court of the District of Columbia in *Synar v. United States*, 626 F.Supp. 1374, 1385 (D.D.C.1986), *aff'd on other grounds sub nom., Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), in which the Court said:

> We reject this "core functions" argument for several reasons. First, plaintiffs cite no case in which the Supreme Court has held *any* legislative power ... to be nondelegable due to its "core function" status. Indeed, in *Lichter v. United States*, 334 U.S. 742, 778–779 ... [68 S.Ct. 1294, 92 L.Ed. 1694] (1948), the Court stated flatly that "[a] constitutional power implies a power of delegation of authority under it sufficient to effect its purposes." Second, judicial adoption of a "core functions" analysis would be effectively standardless. No constitutional provision distinguishes between "core" and "non-core" legislative functions, so that the line would necessarily have to be drawn on the basis of the court's own perceptions of the relative importance of various legislative functions.

This Court agrees with the analysis of the District of Columbia Court. Imposing a "core functions" distinction in analyzing Congress' power to make necessary and proper delegations of its power is unsupported by both the Constitution and common sense, and unnecessarily complicates this issue. Thus, I find that there is no *per se* impediment to Congress' delegating the responsibility to determine approximate sentencing ranges. The issue, then, is whether Congress properly effected the specific delegation in this instance.

Rarely has a delegation by Congress been struck down by the judiciary as violative of the Constitution; indeed, the Supreme Court has only exercised its power to invalidate such a delegation in two instances, both during the New Deal era. *See Panama Refining Corp. v. United States*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Since that period, an extremely deferential standard has been developed by the Supreme Court in considering this issue. A delegation is thus constitutional "[i]f Congress ... lay[s] down by legislative act an intelligible prin-

ciple to which the person or body authorized to [exercise the power so delegated] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). As the Court later added, "[o]nly if ... there is an absence of standards [provided by Congress] ..., so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose." *Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944). "It is clear, therefore, that the delegation of legislative function need not be accompanied by a precise formula for the agency to apply." *Geraghty*, 719 F.2d at 1213.

■ In this case, the delegation of power to the Sentencing Commission does not present a colorable constitutional issue. Congress has provided detailed and explicit guidance as to the duties of the Commission and the aims and purposes of the guidelines it was to develop. *See United States v. Arnold*, 678 F.Supp. 1463 (S.D. Cal.1988); *United States v. Ruiz–Villanueva*, 680 F.Supp. 1411, 1417–18; *United States v. Chambless*, 680 F.Supp. 793, 796–97.

As stated in *United States v. Chambless*, the Commission's powers are amply circumscribed by Congressional guidelines outlined in the Act. These guidelines indicated Congress' purpose in establishing specific standards. It may be the case that Congress could have been more specific in its language. But it is clear that Congress did make the hard policy choices in passing the SRA and, recognizing its own limitations in translating those choices in specific sentencing guidelines, properly delegated that task to a qualified *Commission*.

## V. *Due Process*

■ The defendant Ladd's final argument is that the mechanical procedure of guideline sentencing denies him the due process right to present evidence and challenge the basis of the sentence before the sentencing judge. He is denied, he claims, the right to an individualized sentence, one which takes into account his family situation and other mitigating circumstances.

It is, of course, true that a "defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1205, 51 L.Ed. 2d 393 (1977). And "due process does require that a defendant be afforded the opportunity to assure that accurate and reliable information is presented to a district court, *United States v. Romano*, 825 F.2d 725, 728 (2d Cir.1987), and that judgment is imposed on the basis of materially true statements and accurate information. *Townsend v. Burke*, 334 U.S. 736 [68 S.Ct. 1252, 92 L.Ed. 1690] (1948)." *United States v. Frank*, 682 F.Supp. 815 (W.D.Pa. 1988). From this established principle, however, it does not follow that *only* with completely unfettered judicial discretion in sentencing can the due process rights of a criminal defendant be protected. This argument not only cuts too broadly, it also ignores the fact that discretion is not destroyed by the guidelines, it is merely channelled. The factors that would otherwise be considered by the judge are still considered, but the guidelines describe the weight each is to be accorded. And if a factor is not properly considered by the guidelines, a "safety valve" was provided by Congress in the form of authorized departures from the prescribed sentencing ranges if certain aggravating or mitigating circumstances were present. Additionally, the guidelines provide the judge with a *range* of sentences within which he must assign a sentence. Some discretion, then, is retained under the guidelines, but the unfettered discretion once allowed judges has been circumscribed. Congress has determined the relevance of certain facts, conduct and history to deciding upon an appropriate sentence for certain defendants. In short, then, the guidelines will have the same effect as if Congress had provided a minimum-mandatory range of

sentences that each judge was required to follow for each federal criminal statute.

Secondly, the procedure in making *factual* determinations underlying the sentence does not implicate the due process clause. *See Mathews v. Eldridge,* 424 U.S. 319, 343–347, 96 S.Ct. 893, 907–09, 47 L.Ed.2d 18 (1975) (where the court discusses that aspect of the test designed to determine the constitutional acceptability of a given procedure which focuses upon the reliability of the procedure in finding the necessary facts). There is no dispute that the fact finding abilities of the court have not been changed. Nor has the defendant's right to be present and dispute facts relevant to his sentence been altered by the procedure mandated by the guidelines. It has long been held that due process is a flexible concept, which requires "such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed. 2d 484 (1971). In guideline sentencing, a defendant maintains the right to participate in all phases of the pre-judgment process, from those earliest stages governed by Rule 11 of the Federal Rules of Criminal Procedure to the sentencing hearing itself to any post-conviction remedies that may exist. Those rights include the right to present objections to the conclusions in the pre-sentence report and to present evidence in support of his version of the pertinent facts. *See* Rule 32, Federal Rules of Criminal Procedure.

Indeed, the argument can be made that the defendant is accorded more procedural protection under guideline sentencing than enjoyed previously. In addition to the resolution of factual conflicts described above, a statement of reasons for a sentence imposed within the range must be provided unless the range is limited. Departures, upward and downward, must be supported by a written statement of reasons. Sentences are subject to appellate review. The only avenue now foreclosed by the guidelines is the right to argue the merits of a *particular* sentence and the ability of the court to make free-wheeling adjustments based on that presentation. The defendant does not demonstrate an entitlement sanc-

tioned under the constitution for this latter purpose. While the guidelines control and restrict the court's consideration of certain factors previously left to the district court's discretion and subject to being influenced by the defendant, the defendant without this latter procedural device nevertheless is left with a meaningful opportunity to be heard. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1949).

### VI. *Conclusion*

In accordance with the foregoing, the defendants' motions to declare the Sentencing Reform Act unconstitutional are denied.

SO ORDERED.